1

2

3

4

5

6

7

8                        IN THE UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10   LOUIS TOLEDO RETANAN,

11              Petitioner,                    No. CIV S-08-1429 GGH P

12        vs.

13   JAMES YATES, et al.,

14              Respondent.              <u>ORDER</u>

15   _____/

16   I.  <u>Introduction</u>

17              Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas

18   corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2005 conviction for 16 felony

19   counts and one misdemeanor count of sexual offenses against R.S. (counts 1-7), B.L. (count 9),

20   R.F. (counts 10-14), and R.G. (counts 15-18) as follows: aggravated sexual assault of a child

21   under 14 years of age (Cal. Penal Code § 269(a)(1)(count 1)), committing lewd or lascivious act

22   upon a child under the age of 14 by force or fear (Cal. Penal Code § 288(b)(1)(counts 2-7)),

23   misdemeanor count of annoying or molesting a child under the age of 18 (Cal. Penal Code §

24   647.6(a)(count 9), committing a lewd or lascivious act upon a child under the age of 14 (Cal.

25   Penal Code § 288(a)(counts 10-18).

26              Petitioner is serving a sentence of 135 years to life.

1

1    Petitioner raises three claims: 1) his life sentences pursuant to former Cal. Penal

2    Code § 667.61(g)[1] violate <u>Blakely v. Washington</u>, 542 U.S. 296, 124 S.Ct. 2531 (2004); 2) his

3    consecutive life sentences pursuant to Cal. Penal Code § 667.61(d) violate <u>Blakely</u>, <u>supra</u>; 3) his

4    sentence violates the Eighth Amendment.

5    After carefully reviewing the record, the court orders that the petition is denied.

6    II. <u>Anti-Terrorism and Effective Death Penalty Act (AEDPA)</u>

7    The AEDPA "worked substantial changes to the law of habeas corpus,"

8    establishing more deferential standards of review to be used by a federal habeas court in

9    assessing a state court's adjudication of a criminal defendant's claims of constitutional error.

10   <u>Moore v. Calderon</u>, 108 F.3d 261, 263 (9th Cir. 1997).

11   In <u>Williams (Terry) v. Taylor</u>, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme

12   Court defined the operative review standard set forth in § 2254(d).  Justice O'Connor's opinion

13   for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy

14   between "contrary to" clearly established law as enunciated by the Supreme Court, and an

15   "unreasonable application of" that law.  <u>Id</u>. at 1519.  "Contrary to" clearly established law applies

16   to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme

17   Court on a point of law, or (2) if the state court case is materially indistinguishable from a

18   Supreme Court case, i.e., on point factually, yet the legal result is opposite.

19   "Unreasonable application" of established law, on the other hand, applies to

20   mixed questions of law and fact, that is, the application of law to fact where there are no factually

21   on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

22   <u>Williams (Terry)</u>, 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000).  It is this prong of the

23   AEDPA standard of review which directs deference to be paid to state court decisions.  While the

24   deference is not blindly automatic, "the most important point is that an *unreasonable* application

25   

26   [1]  In 2006, Cal. Penal Code § 667.61 was amended.

1   of federal law is different from an incorrect application of law....[A] federal habeas court may not

2   issue the writ simply because that court concludes in its independent judgment that the relevant

3   state-court decision applied clearly established federal law erroneously or incorrectly.  Rather,

4   that application must also be unreasonable."  Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at

5   1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the

6   objectively unreasonable nature of the state court decision in light of controlling Supreme Court

7   authority.  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

8           The state courts need not have cited to federal authority, or even have indicated

9   awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S.

10  Ct. 362 (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is

11  contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An

12  unreasonable error is one in excess of even a reviewing court's perception that "clear error" has

13  occurred.  Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003).  Moreover, the

14  established Supreme Court authority reviewed must be a pronouncement on constitutional

15  principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

16  binding only on federal courts.  Early v. Packer, 537 U.S. at 9, 123 S. Ct. at 366.

17          However, where the state courts have not addressed the constitutional issue in

18  dispute in any reasoned opinion, the federal court will independently review the record in

19  adjudication of that issue.  "Independent review of the record is not de novo review of the

20  constitutional issue, but rather, the only method by which we can determine whether a silent state

21  court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

22  2003).

23          The California Court of Appeal was the last state court to issue a reasoned opinion

24  addressing the claims raised in this action.  See Respondent's September 5, 2008, lodged

25  document (petition for review, order denying review).  Accordingly, the court considers whether

26  the denial of these claims by the California Court of Appeal was an unreasonable application of

3

1   clearly established Supreme Court authority.

2   III.  Factual Background

3               The opinion of the California Court of Appeal contains a factual summary.  After

4   independently reviewing the record, the court finds this summary to be accurate and adopts it

5   below.

6               FACTUAL BACKGROUND

7               At the time of trial, defendant was 40 years old.

8               R.F. and R.G.

9               R.F. was born in March 1989. R.F.'s cousin, R.G., was born in July 1988. R.F.'s
10              father, Michael F., had been friends with defendant since 1986. From March
                through November of 1997, Michael F. lived with defendant in a house in Rancho
11              Cordova. Defendant owned the house, and Michael F. paid him rent.

12              R.F. lived with her mother in Stockton. She visited her father on weekends during
                the school year and took longer visits during the summer. R.G. would
13              occasionally sleep over with R.F. during these visits. Defendant would watch
                R.F., her two brothers and R.G. when R.F.'s father was away.

14              Defendant jointly molested R.F. and R.G. several times. According to the
                testimony of R.G., this happened once when R.F. and R.G. were sleeping over at
15              the Rancho Cordova residence. The two girls were asleep on the couch when
                defendant started to touch them. He forced them to touch and kiss each other.
16              Defendant placed a finger in R.G.'s vagina.

17              Another time, at R.G.'s grandmother's house,FN2 defendant made the girls shower
                together while he watched them. He then took the girls "in the room and scooted
18              us together while we didn't have our clothes on."

19                       FN2. In November of 1997, defendant moved out of the house he shared
                         with Michael F. to live with his parents in their South Sacramento house.
20                       Michael F. stayed in the house and his parents, the grandparents of R.F.
                         and R.G., moved in with him.

21
                On the following day, defendant watched R.F. and R.G. shower together. After the
22              shower, defendant had the girls touch each other's vaginas. The girls then got
                dressed.
23
                Later that day, the two girls were in a room with defendant and R.F.'s two
24              brothers. The boys were watching television while defendant and the girls were
                lying on a bed. Defendant touched the girls, including putting his finger inside
25              R.G.'s vagina. He made the girls touch each other and kiss each other while they
                were under a blanket. Defendant then took a Polaroid photograph of R.F. with her
26              pants off.

Other molestations took place on a trip to Reno. R.F., her two brothers, Michael F., R.G. and defendant stayed in a hotel during a three-day trip to Reno. While Michael F. was away from the room and the two boys were asleep, defendant made the girls take their clothes off and kiss each other. Defendant had intercourse with R.F. while R.G. was kissing her. The girls were molested all three days they were in Reno.

R.G. testified defendant molested her three times in Reno, twice at her grandmother's house, and once at his house. She was around seven or eight when defendant molested her. The incidents took place on different days, but happened in the same year. Defendant told R.G. if she said anything about this he would " 'kill the person that [she] love[d] the most.' " R.G. took this to mean her grandmother.

R.F. also testified that she and her cousin R.G. were made to kiss each other. Defendant would touch both of them on their breasts and vagina. Defendant had intercourse with R.F. while R.G. was lying next to her. This happened more than once. She was around nine at the time, and R.G. was around 10. R.F. saw defendant molest her two-year-old cousin around this same time.

R.F. was also molested when she was alone with defendant. The molestations started when she was five or six and continued until she was about nine. Defendant started having intercourse with her when she was around eight or nine. He had intercourse with R.F. at least five times, including one or two times in Reno. The molestations took place at defendant's house in Rancho Cordova when her father rented from him, at defendant's parent's house near Mack Road, and in Reno while on a trip.

R.F. stated defendant "touched [her] in ways he shouldn't have-or [that she] didn't want him to." He would touch her vagina with his hand and his mouth. This happened more than 20 times.

R.F. unsuccessfully tried to stop the molestations by hitting defendant on the shoulder. She did not tell anyone because defendant had told R.F. and her cousin "that if [they] ever said anything to anyone he would hurt someone in [their] family that [they] really love[d]." R.F. was afraid of defendant, stating she didn't tell anyone, "Because [she] was scared .... [and] didn't want anything to happen to anyone." She said that "[w]hen [she] was little [she] didn't know that what [she] was doing was wrong or what he was doing was wrong. [She] didn't know what was going on." When she finally told him what he was doing was wrong, defendant said, "So what."

R.F. told her father about the molestations in approximately May of 1998. Michael F. waited until November 1998 to report the crimes to the police because he did not think his friend would do this to his daughter. Michael F. mentioned R.F.'s accusations to defendant, who denied them.

R.S.

R.S. was born in March 1992. She lived in defendant's house between October of 2002 and April of 2003. Her mother and sister also lived there as well as

defendant and two of his friends. R.S. testified that in March and April of 2003, defendant molested her at his house on at least seven different days when she was between 10 and 11 years old.

Defendant once tried to seduce R.S. when she was getting a cat in his bedroom. Defendant took both their clothes off and then got on top of R.S. while she was on the bed. Defendant "started going up and down on [her] body." R.S. tried to get up, but defendant pushed her back down.

On another occasion, R.S. went to use the bathroom in defendant's room. Defendant opened the bathroom door to watch her. R.S. told him to leave, but defendant refused. R.S. tried to walk out of the room, but defendant grabbed her arms and pulled her back. Defendant took off her pants and his clothes. He felt R.S.'s breasts under her shirt while his body went up and down over her.

A different incident occurred in defendant's living room. R.S. was on the couch watching television, when defendant came out naked, pushed her down, and had intercourse with her. R.S. tried to push defendant off, "but he pushed [her] back down." Defendant also put his fingers in her vagina. R.S. then tried to go back into her room to put her clothes on, but defendant blocked the door and dragged her back so that she could masturbate him.

Another incident happened in defendant's room. Defendant took R.S.'s pants off and orally copulated her. R.S. did not try to stop him because she knew defendant would push her down.

Defendant had intercourse with R.S. on at least two separate days. On another day, R.S. had to orally copulate defendant in the kitchen. She did not try to stop or get away as "his hand was on [her] back pushing [her] back and forth."

Another time defendant had R.S. orally copulate him in his bedroom. Defendant also got on top of her, moving his body up and down over R.S. Defendant tried to get R.S. on top of him.

R.S. orally copulated defendant on two separate occasions. Defendant touched her breasts at least three different times. Every night defendant would kiss her good night and try to put his tongue in her mouth. He once tried to put her mother's rubber dildo in her. Defendant had R.S. **182 engage in mutual oral copulation with him in his bedroom.

The molestations took place primarily on Saturdays, but also on a few weekdays. The weekday molestations happened between the time R.S. got home from school and her mother returned from work. R.S. was last molested on April 22, 2003. R.S. did not tell her mother "[b]ecause [she] was scared" and afraid of "[b]eing taken away from her."

Linda R., the mother of R.S., testified that defendant offered to let her live with him so that she could stop using drugs. Linda R. paid rent and slept in the garage, while R.S. shared a room with her older sister. Defendant had his own room, and would often babysit R.S.

Linda R. once came home to find defendant with his shirt off and lying under a
blanket with R.S. After R.S. was taken by Children's Protective Services,
defendant was arrested. Defendant accused Linda R. of French kissing R.S. She
never French kissed her daughter.

B.L.

B.L. was born in August 1993. She would go over to play with R.S. when R.S.
lived at defendant's house. When she was over there, defendant would rub her
back, thighs, shoulders and chest. He also put his hands under B.L.'s shirt. B.L.
saw defendant do bad things to R.S., but she could not remember the details.

Defense Case

Felisa H., defendant's mother, testified she saw Linda R. French kiss R.S. during a
trip to Disneyland. She did not report the incident because R.S. and her mother
ran off to go on rides.

Defendant testified that he had kicked Michael F. out of his Rancho Cordova
house for not paying rent. Michael F. responded by threatening to call the police
about his daughter R.F.'s accusations of molestation by defendant.

According to defendant, R.F. and R.G. were caught naked together by R.F.'s
brothers. The girls then went to their grandmother and accused defendant of
molesting them even though defendant had not been there.

Defendant suspected Linda R. was molesting R.S. In spite of this, he had proposed
marriage to Linda R. Defendant denied all allegations of molestation by the
victims. He was very busy with errands on the first three Saturdays in April of
2003.

Respondent's September 5, 2008, Lodged Documents, Petition for Review; see also People v.

Retaran, 65 Cal. Rptr. 3d 177, 179-182 (2007).

IV.  Discussion

   A.  Claims 1 and 2

      In claim 1, petitioner alleges that each of his life sentences pursuant to former Cal.

Penal Code § 667.61(b) and (g) violated Blakely, supra.  In claim 2, petitioner alleges that the

imposition of consecutive life sentences pursuant to Cal. Penal Code § 667.61(d) violated

Blakely as well.

      The sentencing in this case was rather complex in that the judge was making

pronouncements concerning "no probation" and whether sentences should run concurrently or

consecutively.  Different concerns required different findings under different statutes.  The "life

eligible" offenses which *potentially* can lead to an indeterminate life sentence are set forth in Cal.

Penal Code § 667.61(c).[2]  The circumstances set forth in § 667.61(d) and (e) are the triggering

circumstances which  permitted the sentencing judge to impose the life term, see § 667.61(a) and

(b).  Subsection (g) of 667.61 stands as a limitation on multiple life sentences when the crime(s)

involve a single victim on the same occasion.  In pertinent part, § 667.61 read:

> (a)....
> (b) Except as provided in subdivision (a), a person who is convicted of an offense
> specified in subdivision (c) under one of the circumstances specified in
> subdivision (e) shall be punished by imprisonment in the state prison for life and
> shall not be eligible fore release on parole for 15 years except as provided in
> subdivision (j).
> (c) [there is no dispute that all counts on which defendant was convicted are
> encompassed by subdivision (c)]
> (d)....
> (e) The following circumstances shall apply to the offenses specified in
> subdivision (c):
> .......
>       (5) The defendant has been convicted in the present case or cases of
> committing an offense specified in subdivision (c) against more than one victim.
> (f)....
> (g) The term specified in subdivision (a) or (b) shall be imposed on the defendant
> once for any offense or offenses committed against a single victim during a single
> occasion.  If there are multiple victims during a single occasion, the term...shall be
> imposed on the defendant once for each separate victim.....

With respect to actual sentencing here, the trial judge stated:

> Therefore, as to Count One, regarding a violation of section 269 of the
> Penal Code, it is ordered that defendant be committed to state prison for the term
> of 15 years to life.
>       Regarding the one-strike allegation, it is not imposed pursuant to Penal
> Code Section 667.61(f).
>       As to Counts Two through Seven, it is ordered the defendant be sentenced
> to the term of 15 years to life.
>       Pursuant to Penal Code Section 667.61(b), the court orders each of these
> counts to be served consecutively as they each involve separate incidences which
> occurred on separate dates or involved separate locations against the same victim.
>       Regarding Count Ten, it is ordered the defendant be committed to state
> prison for the term of 15 years to life.

---

[2]All references are to the section in effect when the defendant allegedly committed his
crimes.  The undersigned has utilized the California Penal Code, 2003 Desktop Edition published
by Thompson/West.

1    Pursuant to Penal Code Section 667.61(b), the court orders this sentence to
2    run consecutive, as Count Ten occurred against a separate victim on a separate date.

3    As to Counts Eleven to Fourteen, it is ordered the defendant be sentenced
     to the term of 15 years to life as to each count, to run concurrent.
4    Regarding Count Fifteen, it is ordered the defendant be committed to state
     prison for the term of 15 years to life pursuant to Penal Code Section 667.61(b).
5    The court orders this count to run consecutive as the incident occurred
     against a different victim on a separate date and a location.
6    As to Counts Sixteen through Eighteen, it is ordered the defendant be
     sentenced to the term of 15 years to life, to run concurrent.
7    As to the misdemeanor allegation in Count Nine, probation is denied, and
     the defendant is ordered to serve one year, concurrent.
8    Therefore, the aggregate term ordered in this case is that the defendant be
     committed to state prison for the term of 135 years to life.

9    RT 513-514.

10    In this federal habeas proceeding, petitioner makes the following claims:

11    1.  Twelve of the fifteen life sentences received are invalid because the jury did

12    not determine, pursuant to People v. Jones, 25 Cal. 4th 98, 104 Cal. Rptr. 2d 753 (2001), that the

13    offenses to a single victim were performed on multiple occasions, i.e. not on a single occasion as

14    defined by the case [as set forth above, only one life sentence may be imposed if a single victim

15    on a single occasion is involved][3]:

16    2.  The consecutive sentences imposed were based on findings that a jury should

17    have made;

18    3.  The total sentence violates the Eighth Amendment.

19    The *Blakely* Claims

20    The first claim is at first glance problematic because the jury was never asked to

21    decide the singularity issue, despite the pronouncement of the trial judge at sentencing that the

22    jury had made such a decision.  RT 511-512.  There is nothing in the record suggesting that the

23

24    [3]The court does not agree with respondent's analysis that the issue here involves whether
     a judge could reduce petitioner's life sentence on a count below the statutory maximum.  Section
25    667.61(g) involves the number of 15 years to life sentences which can be imposed, not whether a
     sentence can be reduced below the 15 to life maximum.  Petitioner takes issue only with the
26    number of life sentences imposed, and the finding that some were to be imposed consecutively.

jury was asked to make that determination.  The counts described to the jury never asked for a determination involving particular times, and the counts decided by the jury included within themselves a lengthy passage of time; indeed some of the counts included identical passages of time.  See RT 20-32, 449-461, 476-480.  If a Blakely error occurred, a harmless error analysis would  be possible, Washington v. Recuenco, 548 U.S. 212, 126 S.Ct. 2546 (2006), and the undersigned will discuss that briefly below.

The second claim is a bit more familiar, and involves the issue of whether facts essential for the imposition of consecutive sentences need be found by the jury.  See Ice v. Oregon, 343 Or. 248, *certiorari granted* Oregon v. Ice, 128 S.Ct. 1657 (2008).  On the day this order was signed, the Supreme Court determined that a judge, not a jury, could determine the facts necessary for the imposition of consecutive sentences.  Oregon v. Ice, __ U.S. __, __ S. Ct. __, No. 07-901 (Jan. 14, 2009).

However, because a life sentence is involved, the Blakely problems are eviscerated.  Petitioner does not contest three of the life sentences as long as they are concurrent life sentences.  But petitioner misapprehends the limits of Blakely as first set forth in Apprendi V. New Jersey, 530 U.S. 466, 490, 120 S.Ct. 2348 (2000).  That is, a jury need only be involved in sentencing if a fact at sentencing would take the punishment beyond the statutory maximum. Blakely, 542 U.S. 301, 124 S.Ct. 2536.  When the statutory maximum is life imprisonment, no sentencing question will involve the Apprendi line of cases because the statutory maximum cannot be exceeded.   A sentence beyond one life sentence is essentially meaningless in terms of the "maximum punishment", i.e., one cannot actually be imprisoned for more than one life.  This is true as a matter of practicality and California law.

In California law, the mere possibility of parole does not transmute a life sentence into something lesser than a life sentence.

> As we indicated in Wingo, supra, 14 Cal.3d 169, 121 Cal.Rptr. 97, 534 P.2d 1001, "traditionally '[o]ne who is legally convicted has no vested right to the determination of his sentence at less than maximum' [citation]. Moreover, 'a

1    defendant under an indeterminate sentence has no "vested right" to have his
2    sentence fixed at the term first prescribed by the [parole authority] "or any other
     period less than the maximum sentence provided by statute." ' [Citations.] 'It has
3    uniformly been held that the indeterminate sentence is in legal effect a sentence
     for the maximum term' [citation], subject only to the ameliorative power of the
4    [parole authority] to set a lesser term. [Citations.]" ( Id. at p. 182, 121 Cal.Rptr.
     97, 534 P.2d 1001.) Indeed, "'[i]t is fundamental to [an] indeterminate sentence
5    law that every such sentence is for the [statutory] maximum unless the [parole]
     [a]uthority acts to fix a shorter term.'"

6    In re Dannenberg, 34 Cal. 4th 1061, 1097-98, 23 Cal. Rptr.3d 417 (2006).

7    Thus, the statutory maximum for each of petitioner's counts (once the jury found that several

8    victims were involved in the "case") was life in prison.  The addition of concurrent or

9    consecutive life terms could not change the fact that petitioner has only one life, and

10   imprisonment for that life was the statutory maximum.  The mere possibility that an executive

11   agency could shorten the maximum sentence by granting parole after a set time, here the

12   California Board of Prison Hearings, is irrelevant to the Blakely sentencing analysis.

13            There is no doubt that the consecutive sentencing made the possibility of parole

14   remote indeed for petitioner.  However,  the Supreme Court has never held that the jury is

15   entitled to make findings on factors related to parole considerations.  That is, the extent of the

16   possibility (or the increasing impossibility) of parole on account of the *minimum* term imposed is

17   simply not an Apprendi/Blakely issue.

18            Because the sentence here did not implicate Apprendi/Blakely in that the statutory

19   maximum of life imprisonment was not exceeded by the imposition of additional life sentences,

20   there is no need to engage in a "what if" Apprendi/Blakely were violated analysis.[4]

21            B.  Claim 3

22            In claim 3, petitioner argues that his sentence of 135 years to life is cruel and

23   unusual punishment.

24   _____

25       [4]  However, for respondent's stated reasons (analyzing the decision of the Court of
     Appeal on this point), the undersigned would be hard pressed not to find any alleged
26   Apprendi/Blakely error harmless.

                                              11

1              *The Eighth Amendment Claims*

2              The Eighth Amendment's standard of cruel or disproportionate punishment is

3      gauged against the maximum, statutory sentence.  Except in rare, truly extraordinary,

4      circumstances, a sentence will not be overturned on Eighth Amendment grounds if it lies within

5      the statutory maximum.  United States v. Mejia Mesa, 153 F.3d 925, 930 (9th Cir. 1998).  For the

6      purposes of this case, the court treats the 135 years to life sentence as life without the [realistic]

7      possibility of parole.

8              The appropriate analysis for such a claim was recently set forth in Gonzalez v.

9      Duncan, __F.3d__, 2008 WL 5399079 (9th Cir. Dec. 30, 2008).  The overarching finding to be

10     made is whether the punishment is "grossly disproportionate" to the crime committed.  An

11     affirmative finding is to be made "exceedingly rare[ly]," and only in an "extreme case."  Three

12     factors are generally reviewed to make this determination: (1) the gravity of the offense and the

13     harshness of the penalty; (2) a like sentence imposed on other criminals for other crimes, i.e.,

14     comparing the gravity of offenses; (3) comparison of the same crime in other jurisdictions.  It

15     must again be emphasized that the undersigned does not determine the outcome *de novo*, but

16     under AEDPA standards.  In this case the Court of Appeal utilized the same analysis, and came

17     to the [easily found] conclusion that the 135 years to life sentence did not violate the Eighth

18     Amendment.  Retanan, 65 Cal. Rptr. 3d at 184-185.  Petitioner advances no argument which

19     demonstrates that this conclusion was AEDPA unreasonable.  Indeed, even federal law

20     countenances such a "life without parole" sentence for aggravated sexual offenses against adults

21     and children alike.  18 U.S.C. § 2241.[5]

22             The undersigned need engage in no further analysis as the Eighth Amendment

23     issue is not close.

24     \\\\\

25

26          [5] Because no parole exists for federal offenses, a "life" sentence means exactly that, and there is no early-out for parole or any other reason.

1    After conducting AEDPA review, the court finds that this claim is without merit.

2  Accordingly, petitioner is not entitled to habeas relief as to this claim.

3  *Conclusion*

4    Accordingly, IT IS HEREBY ORDERED petitioner's application for a writ of

5  habeas corpus is denied.  Judgment shall be entered for respondent.

6  DATED: 01/14/09

7                                            /s/ Gregory G. Hollows

8                                            _____
                                             UNITED STATES MAGISTRATE JUDGE

9

10  ret1429.157

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26